Good morning, Your Honor. I'm Mr. Fein, and I'm representing myself in this appeal. I think that there are two major issues that are presented. One is, what is the appropriate articulation of the standard of proving by clear and convincing evidence that an alleged defamatory statement was made with actual malice under the New York Times v. Sullivan articulation? And I submit that the district court erred in adopting the so-called Sheehan standard of unhesitating acceptance to any rational juror. I believe the unhesitating acceptance standard is higher, much more demanding, than the high probability standard that I think this Court and other federal courts of appeals have accepted in defining clear and convincing evidence in other kinds of claims. I think unhesitating acceptance is almost, or requires you to prove some things as certain as the sun rises in the east or sets in the west, meaning you don't deliberate at all as to whether or not the finding you're making could all be contested. And I think the briefs adequately explain that. The second, and I believe... So are there any damages here? In this particular case, Your Honor, we didn't have any chance because this was dismissed at the motion stage. We alleged damage to reputation, and even if it's small nominal damages, that's not a justification, Your Honor, for dismissing the case. Your Honor, we did... No, I understand that your question, Your Honor, is a very good one. Why was the case brought? And I did not want to bring... Well, Mr. Fein, you may want to let him ask the question before you answer it. I apologize. Why even come up here? I mean, I can't believe that this had any impact on your reputation. The reason, Your Honor, is I wrote a letter to Mr. Kesterson, and I said, will you retract your statement? This is not something that customarily should enter court. And he said, no, I will not retract the statement. I didn't put any ultimatum, time limit, three days or whatever. And he insisted on going forward. And it was clear, Your Honor, in the context in which the statement was made, it was calculated to obtain a political advantage. He was trying to discourage someone from having a joint political headquarters with my wife, who was a candidate for the Republican nomination for Congress against Mr. Kesterson. But the question is an excellent one. We don't want to clutter up the court on frivolous arguments. And the effort to try to resolve this amicably was scotched by the defendant here. And later on, even when he's conceded in his declaration that he didn't have proof of the truthfulness of the statement, there wasn't even at that time, well, I will retract and let's have this go away. So that's the sum and substance of it, Your Honor. And in this case, we think that we produced very overwhelming evidence that a jury could find it highly probable that Mr. Kesterson entertained serious doubts, that his accusation that I was implicated in international terrorism by representing, lobbying for. He never said that you were, quote, implicated in international terrorism. Your Honor, that was the allegation that was in the complaint and in the interpretation and the context in which he was explaining what he was asserting. The evidence as to what you say he said. Yes. That is to say we have his statement and we have his email. Correct, Your Honor. And he never said you were implicated in international terrorism. Your Honor, repeatedly throughout this litigation, when I in the complaint and the affidavit described that accusation as accusing me of assisting a listed foreign terrorist organization, LTT, which is on the Secretary of State's list of foreign terrorist organizations. Never once did Mr. Kesterson or his counsel say that is not something that we alleged. So I don't, maybe they could make that argument on a remand, but that is not an issue that was ever raised. It was accepted that that was a defamatory accusation, but it simply wasn't. I understand that. He never used the word terrorism, did he? No. That's your word. Those are my words. Correct, Your Honor. What he did use expressly was reference to the LTT, which is listed as a foreign terrorist organization. And the reference was what? What did he say? That I was lobbying for, aiding the LTT, front organizations for the LTT. Those were the words that he utilized in making the statement to Mr. Stamreich. And front organizations is a broad and ambiguous term, and he had a one, at least perfectly respectable source for that, that is to say the Toronto newspaper. No, Your Honor, if I could interrupt. That's not correct. The Toronto newspaper was quoting a gentleman who did not accuse any group I was representing as an LTT front, didn't accuse me of representing the Tamil Tigers. It stated that they were expats of Tamils. That's the description of his words, expats, who had formed lobby groups. It doesn't mean that they're a terrorist organization. And going forward from that time, it may well be that the Tamil Tigers may utilize this tactic to try to get governments to look adverse on the government of Sri Lanka. At that particular time when this story was written, this was after the Tamil Tigers had been destroyed in May of 2001. Is it part of your claim as to the defamation that you were making seven figures for being a front organization? No, that's a falsehood, but that wasn't the defamatory part, Your Honor, was that I was giving, quote, material assistance to a listed terrorist organization, which is the crime. Now, what you've raised is certainly legitimate. The defendant could argue, listen, all the things that he said were not defamatory. But that wasn't the defense. I've never had a chance to counter the theory that you broached, Your Honor. What theory did I broach? I think that the statements were not defamatory because there was no accusation. I didn't say that. I apologize then for that misconstruction. But insofar as whether the statements were defamatory, that has not been raised as a defense. And when I raised the argument based upon the idea that the accusation was that I was complicit in giving material assistance to a foreign terrorist organization directly or through a front, which is a federal crime, I asked Mr. Kessler and his deposition, well, why didn't you report this to the FBI? This is a very, very serious crime. And he had also stated that he was 90 percent certain that he was correct. Maybe he didn't think he was accusing you of a crime. That may be, Your Honor. That's the first time. I've never heard that from the defendant until you've raised it, Your Honor. Well, I guess even if I raised it, you didn't hear it from the defendant. Correct. So there wasn't any opportunity to respond to that because it wasn't raised. And it was... In terms of the question of malice, what's your response to his statement or defense that he did raise that he was relying on various sources, including the Toronto Star? Well, I think the Toronto Star is the best reliability outlet that he had. But our argument, as we've addressed, is that it was a totally unreasonable interpretation of what that article said. It said it referred to expatriates forming lobby groups. And I was representing expatriates, which is true. They were not connected to the Tamil Tigers. They were never connected to the Tamil Tigers. And that article also said, going forward, that the Tamil Tigers or their remnants, because they had been destroyed in May of 2009, may engage in this lobbying tactic. But that's not involving me. At that time, I wasn't even working, even with the expatriate groups at the time. It's a totally unreasonable interpretation. And remember this, Your Honor, and I don't want to overstate it, that if that's a plausible interpretation, that that report in the Toronto Star was accusing Mr. Fine, my officer a few blocks from the FBI, of providing material assistance, lobbying for the Tamil Tigers, I can guarantee you the FBI would not be long before they'd knock on my door and say, This is credible information, Mr. Fine. What's going on here? That's never happened. I'm standing in front of you right now. No, the FBI, no law enforcement has ever come and said, Are you engaged in lobbying, representing a front group for the Tamil Tigers, or anything else like that. Now, that's not dispositive, which is a totality of the circumstances test. And there could be some other reasons to give credence to this. But also, you need to remember that, despite the fact that Mr. Kess said he had a 90% certainty that I was engaged in this kind of nefarious conduct, he never repeated it, which puts him in a dilemma, because partly you could say, Then why did I bring the suit if he wasn't spreading it around? He didn't tell the person to whom he made the statement that you should check it out yourself. Yeah, that's right. He said, Because I can't verify any of this. So what, I don't know. So he's saying, This is still a federal case that should come up to the Ninth Circuit. Well, why didn't he, the best response, why didn't he retract it? This whole thing could have gone away. I didn't run into court and say, I just want to clutter up the federal courthouse. That's not what I did. I wanted to get this resolved and have this, it's not a, especially after 9-11, it's not a complementary or professional practice to have a claim on the Internet, which will be there forever, including Mr. Kessler's claim, that I represented a foreign terrorist organization. It's not going to go away in the age of the Internet. It's a permanent fingerprint. On the Internet. How was his statement, alleged defamatory statement, on the Internet? The file of lawsuit, the all the, everything that was filed. The file of lawsuit. He didn't file a lawsuit. No, the defendant, well, his, his, his pleadings are in the lawsuit. You brought the lawsuit. That's, that's correct. So as a result of you bringing the lawsuit, now all of this is on the Internet. Yes. Well, I don't know whether, we don't know whether it would have gone on the Internet or otherwise. The fact was, the fact was that he refused to retract it. And if he didn't want to harm me, what's the problem of retracting it? If he didn't want to injure me, why wouldn't he retract it? You know, speaking of retraction, let me read to you from page 40 of your brief. Kesterson preposterously testified, quote, Anything that appears on a government website is automatically credible, just like anything that's quoted in the newspaper is automatically credible. The Democratic People's Republic of Korea Central News Agency exemplifies the lunacy of that assertion. In a June 24, 2010 editorial, the DPRK accuses the United States of having committed thrice-incursion genocide, a juror could reasonably infer that Kesterson had concocted his absurd testimony to justify his reliance on the Sri Lankan Defense Ministry's website and the Asian Tribune as reasonable support for his falsehood that fine was guilty of an international terrorism offense. Do you stand by that paragraph? Yes, I do, Your Honor. The words that I just quoted, Kesterson preposterously testified, quote, Anything that appears, those were not his words, those were yours. But he answered the question. Those were not his words. I apologize. And you said he testified, and you put that in quotation marks. Kesterson concocted his absurd testimony.  Do you care to retract that paragraph? Yes, I would retract that paragraph, Your Honor. He testified that he believed everything was on the website. It's my assertion that a jury could believe that. That is not his answer either. Excuse me? That is not his answer either to the words that you put in his mouth. Well, Your Honor, I believe the fair characterization of the deposition was that he stated that anything that appeared on a government website or in a newspaper was inherently credible. I read the testimony. That's not what he said. I would ask Your Honor to read it again carefully, because I believe that's why he said that he could justify it. Well, Your Honor, if you're going to write this paragraph as part of a lawsuit that is designed to punish someone for something they said during the course of a political campaign, I have to say I don't think much of this lawsuit. This is a bullying, hectoring, intimidating lawsuit based upon a pretty innocuous statement where he says, Check it out yourself. He doesn't go to the FBI, which I think is a point in his defense. He doesn't put it on the Internet. You're the one who's made this into a federal case as a way of intimidating him. Well, Your Honor, if I was intent on intimidating him, why would I ask him to simply retract the statement? It wasn't an effort to try, and I actually accommodated him in the campaigns that I won't do the deposition until after you finish the primary season. It wasn't an effort to bully him whatsoever. He was the one who was saying he was 90% certain, Mr. Fletcher, Judge Fletcher, that I was guilty of lobbying, aiding, providing material assistance to a character. I don't think you want to misquote him. He didn't start with 90%, did he? He started out with 75% to 85%, and then he said now it's 90%. Although he didn't explain how it jumped. You're correct. That's where it began at 75%, but then it was 90% by the time of the deposition. It wasn't clear what had given him the increased confidence. Your Honors, I appreciate your questioning. I'd like to save one minute. Thank you. Good morning, Your Honor. Thomas Vidal on behalf of Mr. Kesterson and the Committee. First, I'd like to state at the outset, I don't know that there's been anything that's been addressed that hasn't been addressed in the brief, so if the Justice judges don't have questions, we'd be willing to submit in the brief. I do like to raise a couple of points, though. The first is, with regard to this issue of retraction, I know it's not directly before the Court, but the question has come up a number of times. We never raised the point because those discussions about retraction were contained in confidential settlement communications, but Mr. Kesterson did seriously consider issuing a retraction in order to put an end to this lawsuit and stop it. He wasn't desiring to prevail in the anti-SLAPP to collect attorneys. Are you going beyond the record now? I'm sorry, Your Honor? Are you going beyond the record now? I believe that I am, Your Honor. I just want to raise the point that Mr. Kesterson did indeed make an offer to retract. There was some settlement discussions on the subject, but those were ultimately declined by Mr. Fine. The parties couldn't come to an agreement. I think Judge Ferris gave you a hint. Yes, Your Honor. Regarding the clear and convincing evidence standard, there's been some discussion in the reply brief we didn't get to address. I'd just like to make a couple of points. Mr. Fine has raised the point that the standard announced regarding commanding the assent of every mine is not the appropriate standard, but the cases that he cites all predate the cases we cited in our brief. He cites a 1997 case, Matco. The cases that we've cited, Al-Noor, are all 2007 and later cases. And there's even a California Supreme Court that recites that same standard in a concurring and dissenting opinion, but states it matter-of-factly that it's the standard in California and that it's used. The Matco case doesn't challenge that standard. It speaks about the standard of probability in a different way, and it still says that the standard is greater than a normal probability preponderance of the evidence standard. Unless Your Honors have questions. All right. Thank you very much. I'll just close by addressing the legal standard issue. I think we agree that the standard of proof of clear and convincing evidence is between preponderance and beyond a reasonable doubt. And I think the case law is pretty clear that it's a high probability standard. But I think also, as our briefs show, that unhesitating acceptance of every reasonable doubt is even higher than high probability approaches that doesn't converge with a reasonable doubt standard. And that was a standard that was too exact in applying the test of whether or not we had submitted sufficient evidence to make out a case for defamation that established the minimal merits standard for slap statutes. Thank you, Your Honor. Okay. Thank both sides for their arguments. The case of Fine v. Kesterson is now submitted for decision. And we're adjourned for the rest of the day. Thank you. Thank you, Your Honor. All rise for the present adjournment.
judges: Korman, Farris, Fletcher